SALVIO DURÁN VÁZQUEZ, demandante y apelante, *v.* SUCESIÓN DE EMILIO B. DURÁN, compuesta de su viuda DÑA. MONSERRATE RIVERA y de su hermana ANA INÉS DURÁN, demandada y apelada.

Núm. 7322.—*Sometido:* Diciembre 15, 1937. *Resuelto:* Julio 30, 1938.

*Leopoldo Tormes García* y *Felipe Colón Díaz,* abogados del apelante; *Fernando B. Fornaris,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR WOLF emitió la opinión del tribunal.

La controversia fundamental en este caso gira sobre la autenticidad de un escrito que aparentaba ser la última

voluntad y el testamento de Emilio B. Durán, quien murió en la ciudad de Ponce el 19 de julio de 1924. El testamento ológrafo en cuestión lee como sigue:

"Queda nombrada mi heredera única y exclusiva mi esposa Dña. Monserrate Rivera de toda la herencia que se obtuviera en el pleito que se está tramitando sobre el capital que fué de mi difunto padre Dn. Baudilio Durán así como también sobre lo que se obtuviere de la indemnización del hundimiento del Carolina y que está en poder este asunto de reclamación del Ledo. Ortiz Toro el que lo inició para la reclamación.

"Por cuanto sólo ella queda como la única que le corresponde todo derecho y poder en éste y demás asuntos míos y también le advierto que no tengo deudas contraídas para con nadie ni tampoco con los abogados los cuales cobrarán un cincuenta por ciento de lo que se obtuviera.

"Por cuanto este documento tendrá su valor después de mi muerte.

"Ponce 14 Junio 1924.

*vuelta*                                     "(Firmado)   E. B. Durán

"Y, además sí deseo que si no hubiera podido hacer una tumba en la sepultura de mi señora madre que lo haga ella en mi nombre y si posible fuere a mi muerte que se me entierre en donde ella se encuentra.

"Vale

"(Firmado)  E. B. Durán."

De la evidencia se desprende que la viuda de Durán, Monserrate Rivera, consultó primero con el abogado Pedro Albizu Campos en relación con la validez de dicho escrito, el cual ella al principio creyó carecía de valor. Después de un examen del documento que convenció a Albizu Campos de su validez legal, el mismo fué llevado ante el Lic. Arturo Ortiz Toro, quien el 6 de mayo de 1925 radicó dicho testamento ológrafo ante la Corte de Distrito de Ponce para su protocolización. Luego de cumplirse con los procedimientos necesarios, el testamento fué finalmente aprobado como auténtico y en 8 de julio de 1925 la corte ordenó su protocolización. Poco después de siete años y medio, el presente litigio fué radicado nominalmente por Salvio, el único her-

mano de Durán (el finado no había sido sobrevivido por descendientes o ascendientes), con el objeto de anular el testamento y obtener así su porción hereditaria de conformidad con la ley aplicable a la sucesión intestada. Ana Inés Durán, única hermana del demandante, ha sido unida como parte demandada debido a que ella se negó a unirse a las pretensiones del demandante.

En la demanda se alegan tres causas de acción. La primera de ellas es en verdad la más importante y las demás son consecuencia necesaria de la misma. La validez del testamento se ataca por dos motivos, a saber:

"(a) Porque la fecha puesta en dicho documento es inexacta, pues en el sitio que figura, fué maliciosamente raspada y puesta otra en su lugar.

"(b) Porque se falsificó la letra y firma de Emilio B. Durán en dicho testamento ológrafo, pues no está escrito y firmado de su puño y letra."

Por las otras dos causas de acción se alega el derecho a toda la herencia bajo los principios de la sucesión intestada, así como el derecho a una suma específica de dinero recibida por la viuda de Durán después de haber muerto éste, como resultado de una reclamación personal de Durán.

La corte inferior resolvió que el testamento era auténtico y que había sido originalmente escrito y firmado por Emilio B. Durán, y que cualesquiera raspaduras que aparecieran de la faz del mismo habían sido hechas con posterioridad a la protocolización del testamento en 1925. Al declarar sin lugar la demanda impuso las costas a la parte demandante.

El primer señalamiento se opone a la admisión como prueba de una deposición del Lic. Pedro Albizu Campos. La idea es que el apelante tuvo conocimiento de que se tomaría la declaración menos de cuarenta y ocho horas antes de la comparecencia de Albizu. El artículo 505 del Código de Enjuiciamiento Civil (edición de 1933) dispone:

"Cualquiera de las partes podrá hacer que la deposición de un testigo en Puerto Rico sea tomada ante un juez o funcionario auto-

rizado para administrar juramentos, previa notificación del tiempo y el lugar del examen, a la parte contraria. Dicha notificación deberá hacerse con cinco días de anticipación por lo menos, añadiéndose, además, un día por cada veinticinco millas de distancia entre el lugar del examen y la residencia de la persona notificada, a menos que un juez del tribunal, por causa justificada, prescribiere un plazo más breve, dictando al efecto la correspondiente orden. En este último caso, copia de la orden deberá presentarse juntamente con la notificación."

El apelante sostiene que los demandados no presentaron causa justificada y que la corte cometió un abuso de discreción.

La primera objeción descansa en el hecho de que seis meses antes de surgir el incidente que ahora está en controversia, cuando el caso iba a oírse originalmente, los demandados radicaron una moción solicitando que la declaración de Albizu fuera tomada en San Juan, toda vez que a él le sería imposible asistir al juicio. El fundamento es que lo anterior demuestra que los apelados tenían conocimiento de la existencia de esta incapacidad por parte del testigo para comparecer a juicio personalmente, desde seis meses antes del juicio, y que por tanto debieron haber radicado su moción con más de tres días de antelación. La moción fué realmente presentada el 9 de enero de 1935, declarada con lugar al siguiente día y la deposición señalada para el 12.

El apelante no nos convence de que la corte cometiera error al admitir la deposición en evidencia. En ningún momento antes del juicio el demandante presentó objeción alguna sobre la festinación con que se llevó a cabo todo esto. No se solicitó prórroga alguna con el objeto de estar en posición de comparecer a la toma de la deposición. Además, la declaración de Albizu es acumulativa, aunque muy pertinente, mas su ausencia no destruiría el caso en favor de los demandados. En vista de todo esto no debe imputársele error alguno a la corte inferior.

■ El segundo señalamiento apenas merece ser discutido. La corte se había negado a permitir que se le hiciera una pregunta a la viuda demandada fundándose en que ya la había contestado. Aparte del hecho de que no se desprende que el apelante se anotara excepción alguna, estamos dispuestos a convenir con el juez sentenciador en que la pregunta era una mera repetición, que ya había sido suficientemente contestada y por ende el incidente estaba cubierto por el artículo 513 del Código de Enjuiciamiento Civil (edición de 1933) que lee:

"El tribunal ejercerá razonable intervención en el modo de hacerse las preguntas, a fin de que resulten en lo posible tan rápidas, claras y poco enojosas para el testigo, como eficaces para la extracción de la verdad; pero dentro de esta regla las partes podrán hacer las preguntas pertinentes y legales que juzgaren oportunas. El tribunal, no obstante, podrá suspender la presentación de nueva evidencia respecto a determinado punto, cuando la evidencia ya presentada fuere tan completa que no diere lugar a duda."

Además, no se demostró claramente la importancia de ulteriores repreguntas.

■ Los dos señalamientos de error siguientes atacan las conclusiones más importantes de la corte inferior. El testamento en controversia presenta ciertas raspaduras en su fecha. Esta parte del mismo lee, "Ponce 14 Junio 1924." El 1 de "14," las tres últimas letras de la palabra "Junio," y el 4 en "1924" presentan prueba inequívoca de raspaduras. Examinando el documento frente a una luz bien fuerte, el mismo demuestra claramente el sitio en que el papel es más fino y como resultado de ello la transparencia es mayor. El apelante insiste en que la prueba no sostiene la conclusión de la corte al efecto de que el testamento ológrafo ofrecido en evidencia no tenía raspadura alguna al ser presentado a la Corte de Distrito de Ponce para su protocolización. También ataca la calificación hecha por el juez de distrito de las firmas y manuscrito del documento, como auténticos de Emilio B. Durán.

No es necesario que hagamos una discusión detallada de la prueba aducida en este caso. Concurrimos fundamentalmente en casi todo lo que el juez sentenciador dice en su opinión. Como resultado de un análisis de la prueba y de nuestro examen personal de los *exhibits,* nos hemos convencido de que Emilio B. Durán escribió el testamento ológrafo que ahora está ante nos y que personalmente lo firmó. Igualmente llegamos a la conclusión de que la preponderancia de la prueba claramente admisible demuestra que cuando el testamento fué protocolizado en 1925 el mismo era legalmente válido.

En lo que concierne a la autenticidad de las firmas y de lo manuscrito, deseamos hacer constar expresamente que el estudio independiente que del testamento y de los otros documentos presentados con él hemos hecho, nos ha convencido de su origen auténtico como testamento. Es cierto, conforme dice la corte inferior, que Durán era indudablemente un calígrafo poco corriente y que con frecuencia cambiaba su estilo de letra o la inclinación de la misma. Existen muchas personas en este mundo, de naturaleza poética o idealista, conforme parece haber sido Durán, que escriben de distinto modo según se sientan de momento.

Al hacer una inspección se nota que el manuscrito en el cuerpo del testamento y las firmas difieren. Hemos considerado detenidamente las firmas en los cheques, en la cédula de identificación como ciudadano, en el pasaporte y en cartas y escrituras, y comparándolas con las que aparecen en el documento en disputa, convenimos con la corte inferior en que las firmas que aparecen en este último fueron escritas por la misma persona y que esa persona fué Durán. En cuanto al manuscrito del cuerpo principal del documento, la prueba no es tan abundante, pero sí se demuestra suficientemente que Durán a veces escribía de ese modo. La letra que aparece en las postales firmadas ''María Teresa'' y ''Malén'', respectivamente, poseen una marcada similitud con la del documento en controversia. La declaración de

Magdalena Oliver, conocida por Ana Inés Durán, sostenía el origen auténtico del manuscrito de la postal firmada "Malén." Francisco Larreguera identificó el manuscrito de la otra postal, que él dice fué escrita en su presencia por el mismo Emilio B. Durán. Este último había trabajado como contador de Larreguera. Además de la prueba anterior, una fotografía del finado, con dedicatoria a su esposa, fué presentada como prueba. El manuscrito se asemeja mucho al del testamento. Se ofrecieron como prueba otros documentos, entre ellos el original de una escritura otorgada ante el notario Leopoldo Tormes en que Emilio B. Durán aparece firmando como testigo y al mismo tiempo en representación de uno de los otorgantes que no sabía firmar. En dicho instrumento se nota una diferencia similar entre la firma y las palabras que anteceden a la misma.

Las declaraciones de los peritos calígrafos Drew, Valiente, Percy y Timothée son interesantes, mas no hallamos razón alguna para desviarnos de las conclusiones a que llegó el juez sentenciador. Timothée, por ejemplo, creyó que las firmas que aparecían en el documento y el cuerpo del mismo fueron escritos por distintas personas. Drew llegó a la misma conclusión luego de estudiar el documento por espacio de cinco minutos. No podemos convenir con sus observaciones.

Dada la opinión que hemos formado sobre la autenticidad del manuscrito del testamento, el señalamiento de error en torno al origen y época en que se efectuaron las supuestas raspaduras en el documento es considerablemente debilitado. Decimos esto porque sería irrazonable imaginarse que Durán hubiera hecho esas raspaduras y que éstas pasaran inadvertidas después de su muerte y durante todo el proceso de protocolización.

Para sostener la conclusión de que el testamento no fué anulado por ningunas raspaduras no salvadas al tiempo de su aprobación, tenemos las declaraciones de Monserrate Ri-

vera, la viuda, la de Pedro Albizu Campos y la de Rafael Díaz Cintrón, que fué el juez que presidió la corte en la época en que se ordenó la protocolización del testamento. En adición a esto tenemos el caso prima facie que existe en favor del estado perfecto del documento, como resultado de su protocolización, así como toda la prueba presentada para demostrar las buenas relaciones existentes entre el testador y su viuda, las que tendían a sostener semejante disposición testamentaria. Estamos en desacuerdo con el apelante cuando sugiere en su alegato que incumbe a este tribunal o a cualquier otro determinar quién hizo las raspaduras. Habiendo llegado a la conclusión de que las mismas, que son evidentes, fueron hechas en el documento en época posterior a su protocolización, no hay necesidad de determinar la identidad de la persona que las hizo. El apelante no ha presentado un caso suficiente. Meramente hizo surgir una duda en torno a la validez del documento al demostrar que, ocho años después de haber sido debidamente protocolizado, apareció con ciertas raspaduras. En nuestra opinión ello no basta, especialmente en vista del hecho de que los autos de la protocolización fueron examinados por personas extrañas al testamento en varias ocasiones luego de ser el mismo aprobado por la corte, incluyendo uno de los letrados del demandante, aunque esto de por sí no tiene ningún significado especial. Lo que sí tiene su significado es que se presentó más de una oportunidad para que alguien hiciera las raspaduras.

El último señalamiento se refiere a la imposición de costas. No hallamos razón alguna para alterar este pronunciamiento.

*La sentencia apelada debe ser confirmada.*

El Juez Asociado Señor De Jesús no intervino.